UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDDIE CHASE,

                    Petitioner,                Case No. 2:17-cv-13435
                                                  Hon. Denise Page Hood

v.

TONY TRIERWEILER,

                    Respondent.

_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A CERTIFICATE OF APPEALABILITY, (3) AND GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254. Petitioner Freddie Chase was convicted after a jury trial in the Wayne Circuit Court of kidnapping, MICH. COMP. LAWS § 750.349, two counts of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b, unlawful imprisonment, MICH. COMP. LAWS § 750.349b, and two counts of felonious assault. MICH. COMP. LAWS § 750.82. Petitioner was sentenced to two consecutive 25-to-80 year terms for the criminal sexual conduct convictions and lesser concurrent terms for his other convictions.

The petition raises ten claims: (1) Petitioner was denied the effective assistance of counsel for failing to request an adverse inference instruction with respect to missing 9-1-1 call recordings, (2) the destruction of the 9-1-1

recordings constituted the suppression of exculpatory evidence, (3) the trial court erred in admitting the expert opinion testimony of a nurse who treated one of the victims, (4) the prosecutor failed to call an eyewitness at trial, (5) the prosecutor allowed the victim to give false testimony, (6) Petitioner was denied his right to take a polygraph examination, (7) Petitioner was erroneously ordered to submit to lifetime electronic monitoring, (8) Petitioner's sentencing guidelines were scored in violation of his jury trial rights, (9) Petitioner's trial counsel was ineffective for failing to call two witnesses at trial, and (10) appellate counsel was ineffective for failing to raise Petitioner's post-conviction claims on direct review.

The Court will deny the petition because Petitioner's claims are without merit or barred by his state court procedural default. The Court will also deny a certificate of appealability, but it will grant permission to appeal in forma pauperis.

## I. Background

Petitioner's convictions stem from allegations that he beat Juante Stokes and Cecilia Clark with a hammer and then sexually assaulted Clark.

The evidence presented at trial indicated that Petitioner lived at a house on Charlemagne Street in Detroit. Petitioner resided in a downstairs apartment,

and he rented an upstairs flat to Stokes.

Cecilia Clark testified that she was Stokes' girlfriend and was visiting him on the evening of February 12, 2013, and into the early morning hours of February 13, 2014. Dkt. 10-8, at 38-39. While she was with Stokes in his flat, Petitioner called Stokes to come downstairs. After a few minutes, Clark went downstairs also, and she saw Petitioner hitting Stokes with a hammer. Another man, "Zeke," was also hitting Stokes. Id. at 41-42, 43, 67-68.

Petitioner saw Clark, and told her, "Bitch, you going to get it too," and then he hit her with the handle part of the hammer. Id. at 43-44, 82. The apparent motivation for the attack was Zeke's belief that Stokes stole his cell phone. Id. at 45. Clark saw Stokes try to jump out of a window, but a plastic cover prevented him from escaping. Id. at 48. Petitioner then continued to beat Stokes with the hammer. Id. at 49.

Petitioner forced Clark to take off her clothes, and then he forced her to perform oral sex on him. Id. at 46-47, 85. Clark complied to Petitioner's demands because she did not want to be hit with the hammer again. Id. at 47.

Zeke then dragged Clark by her hair into a back bedroom. Id. at 47-48, 87-89. In the bedroom, Petitioner penetrated Clark's vagina and tried to penetrate her anus several times. Id. at 50-52, 64. While she was in the

bedroom, Clark heard that police come to the house, but she did not call out for help because Petitioner was in the room with her, he had locked the door, and he still had the hammer. Id. at 51-52, 93, 96-97.

Sometime later, Clark heard pounding at the front door, and she recognized the voice of Petitioner's girlfriend. Petitioner told Clark to get dressed and leave. She found her clothing in the bedroom, ran back upstairs to Stokes' room to get her purse, and then she left. Id. at 55-56, 94.

Clark ran to Stokes' mother's nearby house. Id. at 56. Stokes was already there. He was badly beaten and was bleeding. Id. at 57. Clark was also in pain from the beating, and her vagina and rectum hurt. Id. at 57-58.

Clark's mother eventually came to take her home. Id. at 59-60. She stayed there for a day, and then she went to the hospital the following day. Id. at 60-62. She spoke with police at the hospital and spoke with a detective the day after that. Id. at 65-66.

Stokes testified that he had known Petitioner for a couple of years, and he started renting a room from him in January of 2013. Id. at 107-109. On February 12, 2013, Petitioner was intoxicated, and his friend Zeke was also present at the house. Id. at 111-114.  Around 8:00-9:00 p.m. that night, Stokes was called downstairs, and Petitioner started to hit him all over his body with

both the head and handle of a hammer. Id. at 115, 135-136, 138. Zeke also punched and kicked Stokes. A few minutes later, Clark came downstairs and tried to leave, but Petitioner stopped her and hit her with the hammer. Id. at 115. Petitioner forced Clark to perform oral sex while Zeke continued to hit Stokes. Id. at 117-118.

When Petitioner and Zeke took Clark into a back bedroom, Stokes fled to his mother's house. Id. at 121-122. There they called the police several times. Id. at 122-123, 145. (Police came to Stokes' mother's house the next morning. Id. at 123.)

Stokes was bleeding from his head and was in pain, but he decided not to go to a hospital because he could not afford the bills. Id. at 123, 124. Clark made it to his mother's house about twenty minutes after he arrived. Id. at 124. Stokes went to the police station the following day, February 14th, and photographs were taken of his injuries. Id. at 124-30.

Kristin Howard testified that she was a registered nurse and worked at Detroit Receiving Hospital. She was trained in sexual assault forensic examination. Id. at 148-149. She examined Clark on February 14, 2013, at 1:09 a.m. Id. at 156. Clark told her that she was assaulted on February 13, 2013, at about 1:00 a.m. Id. Howard observed several abrasions on Clark and

bruising on the inner thigh. Id. at 162-167. There was no observed injury to the vagina or anus. Id. at 168-169, 182, 183. Howard took a swab sample and completed the evidence collection kit. Id. at 171-173. None of Petitioner's genetic material was detected. Id. at 206-207, 208.

Detroit Police Officer Alejandro Vela testified that he was dispatched to Detroit Receiving Hospital on February 14, 2013, at 1:48 a.m., where he interviewed Clark. Dkt. 10-9, at 6-8.

Leah Gaymon testified that she was Stokes' mother, and in the early morning hours of February 13th, her son came to her house. He was bloody and had knots on his head. Id. at 12-13. Stokes told her that his girlfriend was being raped at Petitioner's house. Id. at 15. She and her daughter ran to Petitioner's house and heard Clark screaming. She called 9-1-1 multiple times. Id. at 15-18, 20, 30.

Subsequently, Clark arrived at Gaymon's house. She was crying and had knots on her head. Clark said Petitioner said he was going to kill Stokes, and she said that Petitioner had raped her. Id. at 19, 21. Gaymon told Clark that she had called the police, and Clark replied that she knew that because the police had come to the house when she was held in the back room. Id. at 20.

Detective Laura Marzella testified that she was assigned to the case on

6

February 15, 2013. Id. at 44. She met with Clark and Stokes on that day and took photos of Stokes' injuries. Id. at 45-46.

Marzella said that there had been several calls to 9-1-1, and that police officers had been sent to the scene. Id. at 49-50, 55. She testified that a recording of the first call, coming at 9:52 p.m. from a male caller, was not available, because it had been routed as a request for medical services, and not to the police. Id. at 65, 66, 69-70. She had a CAD (computer aided dispatch report) summary of that call. Id. at 62. The next two 9-1-1 calls came from Gaymon, at 10:07 p.m. and 10:32 p.m. Id. at 66.

Based on this evidence, Petitioner was convicted of the offenses indicated above. Following his convictions and sentences, Petitioner filed a claim of appeal in the Michigan Court of Appeals. Petitioner's brief on appeal raised one claim:

> I. Mr. Chase was denied the effective assistance of counsel through counsel's failure to request and secure a missing/destroyed evidence instruction, as found in CJI2d 5.12, where such an instruction was supported by the record. As a result of that failure, Mr. Chase was denied his state and federal constitutional rights to a fair trial by a properly-instructed jury and effective assistance of counsel, as guaranteed him under the Sixth Amendment and Const. 1963, art. 1, §20, and his due process rights to defend against the charges, as guaranteed him under the Fourteenth Amendment and Const. 1963, art. 1, §17.

The Michigan Court of Appeals affirmed Petitioner's convictions in an

unpublished opinion. *Chase*, 2014 WL 5364177.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court that raised the same claim and an additional two new claims:

> II. Was defendant-appellant deprived of his Sixth Amendment right to the effective assistance of counsel where counsel failed to thoroughly investigate alibi, where hospital records were available which could have substantiated defendant Chase's innocence?
>
> III. Was defendant-appellant deprived of his state and federal constitutional rights to the effective assistance of counsel. where counsel refused to brief and/or raise the claims within defendant appellant Chase's motion to expand the record, regarding evidence centered around his alibi defense?

The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Chase*, 862 N.W.2d 202 (Mich. 2015)(Table).

Petitioner then returned to the trial court and filed a motion for relief from judgment, raising what now form his third through tenth habeas claims. The trial court denied the motion for relief from judgment citing Michigan Court Rule 6.508(D)(2) (issues raised in an earlier appeal), Rule 6.508(D)(3) (lack of good cause and actual prejudice), and the merits. See Dkt. 10-15.

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, but it was denied because Petitioner "failed to establish that the

trial court erred in denying the motion for relief from judgment." *People v. Chase*, No. 331665, Mich. Ct. App. Order (June 22, 2016). Petitioner appealed to the Michigan Supreme Court, but his application was denied because Petitioner "failed to meet the burden of establishing entitlement to relief under Mich. Ct. Rule 6.508(D)." *People v. Chase*, 901 N.W.2d 388 (Mich. Sept. 12, 2017)(Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal

habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

A. Missing 9-1-1 Recording

Petitioner's first claim asserts that he was denied the effective assistance of counsel when his trial attorney failed to move for an "adverse-inference" jury instruction regarding the missing 9-1-1 call recording. His related second claim asserts that the prosecutor violated his constitutional rights by destroying or withholding the recording.

After reciting the governing constitutional standard for these claims, the Michigan Court of Appeals rejected the arguments on the merits:

> The prosecution has a duty to preserve evidence that might be useful to a criminal defendant. *People v. Leigh*, 182 Mich. App. 96, 97-98 (1989). "A criminal defendant can demonstrate that the state violated his or her due process rights under the Fourteenth Amendment if the state, in bad faith, failed to preserve material evidence that might have exonerated the defendant." *People v. Heft*, 299 Mich. App. 69, 79 (2012). Similar to CJI2d 5.12, the missing witness instruction, this Court has explained that with regard to missing evidence, the trial court may instruct the jury that it may infer that the missing evidence would have been favorable to the defendant. *People v. Davis*, 199 Mich. App. 502, 514-515 (1993), overruled on other grounds *People v. Grissom*, 492 Mich. 296 (2012). Such an instruction is only warranted where the defendant demonstrates that the prosecutor or police acted in bad faith in failing to produce the evidence. *Id.* at 515. The defendant bears the burden of demonstrating bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).
>
> Here, an adverse inference instruction was not warranted because there was no evidence of bad faith on the part of the police or the prosecution. Manzella testified that the audio recording was not available because it was inadvertently deleted after she did not initially search for medical calls in addition to calls for police assistance. Further, defendant cannot carry his

burden of demonstrating bad faith because the record reveals that, upon discovering the existence of the call, the prosecution and the police tried to locate the recording, but were unable to do so. Defendant has not produced any evidence suggesting that the prosecution or the police actively suppressed the telephone call or that they undertook any effort to prevent defendant from discovering the call. Rather, on this record, the evidence suggests that the call was inadvertently overlooked, and then destroyed as a matter of routine maintenance. The routine destruction of recorded police material, when the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal. *People v. Johnson*, 197 Mich. App. 362, 365 (1992). See also *United States v. Garza*, 435 F.3d 73, 76 (1st Cir. 2006) ("[T]hat evidence was destroyed in the course of implementing routine procedures militates against a finding of bad faith.")

Therefore, on this record, an adverse inference instruction was not warranted. See *Davis*, 199 Mich. App. at 514-515. Because the instruction was not warranted, defense counsel could not be ineffective for failing to request it. Counsel is not required to make meritless motions. *People v. Knapp*, 244 Mich. App. 361, 386 (2001). Furthermore, defendant has not established that the missing audio recording was exculpatory or in any way beneficial to his case. Rather, his assertion that the recording could have given the jury reason to question Stokes's credibility is entirely speculative. And, in making this claim, defendant ignores that the CAD report, which contained a summary of the call, actually corroborated the victims' testimony. Indeed, the CAD report indicated that there was a sexual assault in progress and that the victim was being held against her will.[2]

* * *

[2]In addition to arguing that he was denied the right to a properly instructed jury and the effective assistance of counsel, defendant argues, in passing, that the missing audio recording violated his right to confront witnesses and his right to present a defense. Because we find that there is no error in relation to the missing

audio recording, we reject defendant's additional constitutional claims predicated on the missing audio recording.

*Chase*, 2014 WL 5364177, *3-4.

This decision was reasonable. First, success on an ineffective assistance of counsel claim requires a criminal defendant to point to evidence of his trial counsel's deficient performance and then explain how that deficient performance prejudiced his legal defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient where it falls below an objectively reasonable standard. *Id.* at 688. The prejudice element requires the defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Since § 2254(d) applies to these four claims, this already deferential deficient-performance test becomes "doubly so." See *Harrington*, 562 U.S. at 101.

Petitioner points to no evidence indicating any bad faith on the part of the police or prosecutor that resulted in the loss of the 9-1-1 call recording. *See Youngblood*, 488 U.S. at 58. The state court determined that Petitioner was therefore not entitled to an adverse inference instruction. As the state court

correctly found, counsel was not ineffective for failing to raise a meritless objection. See, e.g., *Bradley v. Birkett*, 192 F. App'x. 468, 475 (6th Cir. 2006).

With respect to his claim that exculpatory evidence was destroyed or withheld, the record shows that the 9-1-1 calls in question corroborated the victims' testimony and undermined Petitioner's claim that he was in the hospital at the time of the offense. See *Bell v. Howes*, 703 F.3d 848, 854 (6th Cir. 2012).

Petitioner has not obtained a transcript of the call as he claims in his reply brief, but his claim refers to the same EMS CAD summary reviewed by the Michigan Court of Appeals. See Dkt. 1, Page ID 62. The CAD reflects a call coming in at 9:52 p.m. (21:52:54), with a report "11142 CHARLEMAGNE ST. [Petitioner's address].... RAPE I/P AND BEING HELD AGAINST HER WILL PER CLR.... CLR SOUNDED AS IF HE WERE OUT OF BREATH.... LINE H/U.... NFI...." Id. A follow-up call coming in at 10:07 p.m. (22:07:32) indicates, "F CALLER SEZ THAT HER SON WAS AT THE LOCATION HE WAS ASSLTD W A HAMMER.... HE IS NOW AT HIS MOM'S HOUSE AND 3 MALES R RAPING HIS GF...." Id. The police CAD contains the same information. Id., at Page ID 63.

A follow-up EMS CAD timed a few hours later at 12:09 a.m. indicates a report at Petitioner's address, "45YO M STABBED N NECK. M WAS FITING WITH SOME1 AND WAS STABBED IN NECK... NFI. REQ SCT/EMS." Id., at Page ID 64. The follow-up police CAD indicates that officers confirmed that a person was found stabbed at Petitioner's address and that EMS was dispatched. Id., at 66. The hospital records relied upon by Petitioner and attached to his petition indicate that Petitioner was first seen in the emergency room at 12:52 a.m. with a stab wound to the neck. Id., at Page ID 45-55.

Accordingly, nothing exculpatory was withheld or destroyed by the police or prosecution, nor do the records presented by Petitioner suggest a viable claim of actual innocence. It is true that at one point during trial Clark erroneously testified that the assault occurred on the night of February 13. See Dkt. 10-8, at 75-76. But that testimony was clearly mistaken as all the other evidence, testimony, and records indicate that the events occurred on the night of February 12 and into the early morning hours of February 13. The missing 9-1-1 recordings therefore would not have undermined Clark's credibility in any meaningful way. At most they would have added to the information agreeing that the events occurred on February 12.

Moreover, the CAD summaries show that the 9-1-1 call contents were consistent with the victims' testimony. They indicate an assault with a hammer, they corroborate the testimony that Stokes escaped to his mother's house, and corroborate the claim that Clark was held and raped at Petitioner's house after Stokes escaped. The later record indicates that sometime after Clark escaped, an unknown person stabbed Petitioner in the neck at his house, and he was taken to the hospital.

Accordingly, Petitioner's counsel was not ineffective in the way he dealt with the missing 9-1-1 recordings. He was not entitled to an adverse inference instruction because the transcripts were not destroyed in bad faith, and in any event the content in the calls generally corroborated the victims' testimony and was not exculpatory. Finally, Petitioner's medical records do not show that he was at the hospital at the time of the offense. Rather, taken together with the CAD summaries, the records show that Petitioner was stabbed at his house sometime after both victims had escaped.

Petitioner's first and second claims were therefore reasonably rejected by the Michigan Court of Appeals.

<u>B. Procedural Default</u>

Petitioner's remaining claims were presented to the state courts in his motion for relief from judgment and the appeal that followed it. The trial court denied the motion for relief from judgment, stating in part, "defendant has failed to meet the heavy burden pursuant to MCR 6.508(D)(3)(a) 'good cause and actual prejudice', his motion for relief from judgment must fail." See Dkt. 10-15, at 9. The Michigan appellate courts subsequently denied relief by issuing unexplained orders. Dkt. 10-16, at 1; Dkt. 10-17, at 1.

In denying Petitioner's post-conviction appeal, the state appellate courts orders were ambiguous as to whether they refer to the procedural default provisions of Rule 6.508(D)(3) governing post-conviction review proceedings in Michigan Courts or whether they denied relief on the merits. See *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010)(en banc). The language of the trial court's order, however, made it apparent that the court denied relief under Rule 6.508(D)(3), which precludes review of an issue raised in a post-conviction motion if that issue could have been raised on direct appeal unless the petitioner shows cause and prejudice or actual innocence.

Enforcement of Michigan Court Rule 6.508(D)(3), as the trial court did here, constitutes "an independent and adequate state ground sufficient for

procedural default." *Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012). Accordingly, because the last reasoned state court opinion was based on Petitioner's failure to comply with a state procedural rule, Petitioner's post-conviction claims are procedurally defaulted *Id*. Review of these claims is therefore barred unless Petitioner demonstrates cause and prejudice for the default, or if he demonstrates that he is actually innocent. *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).

In his tenth habeas claim, Petitioner argues that his appellate counsel was ineffective for failing to raise his post-conviction review claims on direct appeal, and that this constitutes cause to excuse his procedural default. Appellate counsel, however, is not required "to raise every non-frivolous issue on appeal." *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003). Indeed, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Where appellate counsel "presents one argument on appeal rather than another . . . the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present'" to establish ineffective assistance of

counsel. *Caver*, 349 F.3d at 348 (quoting *Smith v. Robbins*, 528 U.S. 259, 289 (2000)).

A review of Petitioner's post-conviction review claims shows that they are not "clearly stronger" than the ones raised on direct review. Appellate counsel was not ineffective for failing to raise them on direct review, and Petitioner has therefore failed to demonstrate cause to excuse his procedural default.

### 1. Testimony of Kristin Howard

Petitioner's third claim asserts that nurse Kristin Howard was erroneously allowed to testify as an expert witness regarding her observations of Clark's injuries. The trial court found that as a matter of state law the testimony was properly admitted. Dkt. 10-15, at 3-4. This Court will not second-guess a state court's determination that evidence was properly admitted under state law. See *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). This claim is not clearly stronger than the ones raised on direct review.

### 2. Failure to Produce Sharon Clark

Petitioner next claims that the prosecutor was required to call Sharon Clark, the mother of Cecilia Clark, as a witness at trial. But as the trial court found, there is no allegation that Sharon Clark was present at the time of the offense. Dkt. 10-15, at 4-6. The prosecutor was therefore not required to call

her as an eyewitness at trial, as Petitioner claims. See *People v. Harrison*, 44 Mich. App. 578 (1973). This claim is not clearly stronger that the ones raised on direct review.

### 3. Presentation of False Testimony

Petitioner asserts that the prosecutor allowed Cecilia Clark to testify about injuries she received to her head when the medical records did not indicate any such injuries. Clark testified that when she arrived at Stokes' mother's home she "had a dent right in the middle of my head." Dkt. 10-8, at 57. She further testified that she felt pain in the lower part of her body including her vagina, stomach, and rectum. Id. at 59. Petitioner asserts that hospital records do not indicate any injury to Clark's head.

Contrary to Petitioner's allegations, a medical document attached to Petitioner's motion for relief from judgment shows a diagram of an adult women with a line drawn indicating the middle of the forehead, and it says "point of tenderness." Dkt. 10-13, at 128. This claim is not clearly stronger than the ones presented on direct review.

### 4. Polygraph Examination

Petitioner asserts that he was denied his right under state law to undergo a polygraph examination. The trial court found that even if Petitioner had a right to such an examination, any results would not have been admissible at trial. See *People v. Barbara*, 400 Mich. 352 (1977). Accordingly, the results of any polygraph test would not have impacted the outcome of the trial. Dkt. 10-15, at 6-7. The claim is therefore without merit as a matter of state law, and appellate counsel was not ineffective for failing to raise it on direct review.

### 5. Lifetime Electronic Monitoring

Petitioner next asserts that he was erroneously sentenced to lifetime electronic monitoring. But as the trial court found, monitoring was warranted under state law. See Dkt. 10-15, at 6-7; MICH. COMP. LAWS § 750.520(d). Appellate counsel was not ineffective for passing on this meritless claim.

### 6. Sentencing Guidelines

Petitioner argues that the trial court erroneously scored several of the sentencing guideline factors by relying on facts not found beyond a reasonable doubt by a jury. Petitioner challenges the scoring of variables related to the aggravated use of a weapon, the lethal potential of the weapon used, the physical injury to the victim, the psychological injury to victim, the use of

excessive brutality, the existence of multiple sexual penetrations, and his leadership role in the offense.

Petitioner relies on *Alleyne v. United States*, 570 U.S. 99 (2013), in support of his claim. The applicability of that decision to Michigan's sentencing guidelines at the time of Petitioner's direct appeal was, at best, unclear. At the time of Petitioner's direct appeal, the Sixth Circuit held that "*Alleyne* dealt with judge-found facts that raised the mandatory minimum sentence under a statute, not judge-found facts that trigger an increased guidelines range."See *United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014); see also *United States v. James*, 575 F. App'x 588, 595 (6th Cir. 2014) (collecting cases and noting that at least four post-*Alleyne* unanimous panels of the Sixth Circuit have "taken for granted that the rule of *Alleyne* applies only to mandatory minimum sentences.").

The Michigan Supreme Court did eventually find merit in a claim similar to Petitioner's. See *People v. Lockridge*, 498 Mich. 358 (2015). And the Sixth Circuit recently granted habeas relief on a challenge to Michigan's sentencing guidelines on the basis of *Alleyne*. *Robinson v. Woods*, 901 F.3d 710 (6th. Cir. 2018). But such a result would not have been obvious to appellate counsel at the time he prepared Petitioner's direct appeal. Counsel was not ineffective for

failing to raise a claim under *Alleyne* given the state of the law at the time of Petitioner's direct appeal. See, e.g., *Wilford v. Smith*, 2017 U.S. Dist. LEXIS 122544, *18-19 (W.D. Mich. July 5, 2017).

### 7. Additional Claims of Ineffective Assistance of Counsel

Petitioner finally asserts that his trial counsel was ineffective for his failure to call two eyewitnesses in his defense, Dominiquis Edwards (Petitioner's girlfriend) and Richard Robinson. Yet Petitioner failed to offer the state courts or this Court the proposed testimony of these witnesses. "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013)(quoting *Strickland*, 466 U.S. at 689). On this record there is no basis on which to conclude that trial counsel performed deficiently by failing to call these witnesses. Therefore, Petitioner has not shown that appellate counsel was ineffective for failing to raise this speculative claim.

Accordingly, Petitioner has failed to demonstrate cause to excuse the procedural default of his state post-conviction review proceeding claims.

As Petitioner's claims are without merit or barred by his procedural default, the petition will be denied.

23

## IV. Certificate of Appealability

A certificate of appealability will be denied because Petitioner has failed to demonstrate a substantial showing of the denial of a constitutional right with respect to any of his claims. 28 U.S.C. § 2253(c)(2) and (3); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

The Court will grant permission to appeal in forma pauperis because an appeal of this decision could be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **DENIES** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED.**

s/ Denise Page Hood
Honorable Denise Page Hood
United States District Judge

Dated: February 12, 2019